[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this marital dissolution action, the parties marriage was dissolved on May 14, 1998. At the time of the dissolution, and by agreement of the parties, the court retained jurisdiction for a later determination of issues regarding custody, alimony, child support, property disposition and fees. This memorandum addresses the reserved issues. Based on the trial evidence, the court makes the following findings and orders.
The parties were married on August 17, 1974 in Bloomfield, Connecticut. They have three children; Colin and Martha who were born on December 12, 1983, and Mallory, who was born on March 7, 1993.
The parties have been separated since July, 1995 when the defendant moved from the family residence at 33 Hoskins Road, Bloomfield at the plaintiffs request. While the plaintiff has continued to reside at the Hoskins Road home, the defendant lives on Duncaster Road in Bloomfield, in his parents' former home, now owned by a trust in which he has a beneficial interest.
During the pendency of this action, the parties have shared joint physical and legal custody of the children. Because the homes are in close proximity, the children have moved back and forth with relative fluidity. While the parties agree generally to continue sharing their responsibility, Mrs. Spencer has indicated a desire to move from Hoskins Road. She does not like the home and would like to live elsewhere in Hartford County.
The older children, Colin and Martha, attend private high schools while Mallory attends the public school in Bloomfield which the twins attended when they were younger. While they have a set schedule for seeing each parent, they have free and easy access to both their parents' homes, and Martha maintains a horse CT Page 3907 at her father's residence.
At the time of the hearing, Attorney Nancy Thomson, counsel for the minor children, submitted proposed custody orders which include a joint custodial parenting schedule. The schedule proposed by Attorney Thomson is in the best interest of the children. Physical and legal custody of the children is awarded jointly to the parties. Their respective parenting time with the children shall be as set forth in Paragraph Twelve of Attorney Thomson's proposed orders. Additionally, the provisions of Paragraphs Four, Five, Six, Seven, Eight, Nine, Ten, Eleven, and Fourteen are adopted by the court and ordered. In preparing the judgment file, counsel for the plaintiff shall set forth these provisions in detail. While the court is mindful of counsel's proposal that the parties be required to mediate any parenting difficulties before returning to court, and the proposal limiting the right of either party to relocate, the court has declined to adopt these two proposals. As to mediation, while parents should be encouraged to take responsibility for negotiating their parenting terms without resort to the court, trial evidence does not support a judicial conclusion that, in this case, the benefits of mediation should arise to a preclusion from court. With respect to relocation, while the court believes that the present geographic proximity of the parties has been an important factor in the evident success of their present shared custody arrangement, that success does not warrant a restriction limiting the right of either parent to move. However, this order of joint physical and legal custody is premised, in part, upon the present location of each parent which affords the children easy access to both as well as the stability of remaining in the home of their upbringing. Therefore, relocation by either party from his or her present residence may be considered by the court in the future to be a material change of circumstances warranting a modification of the presently-ordered parenting arrangement. In the event either parent decides to move from his or her present residence, he or she shall provide the other with ninety (90) days advance written notice of such intention. including within such notice the address to which the party intends to relocate.
In July 1995, when the plaintiff asked the defendant to move from the Hoskins Road residence at the plaintiffs request, she was romantically involved with Austin Barney, a gentleman with whom she has continued the relationship. While each party testified concerning the cause of the marital dissolution, the court finds that the primary cause of its failure and attendant CT Page 3908 dissolution was the plaintiffs relationship with Mr. Barney.
Mrs. Spencer, who is forty six years old, earned a Bachelor of Arts in Art History in 1976. Subsequently, she attended a course dealing with the auction business During the course of the marriage, she had little employment outside the home. Presently, she is employed part-time by the Nadeaus Auction Gallery, earning approximately nine ($9) dollars an hour and working eighteen (18) hours a week. Though the plaintiff testified that her child-care responsibilities limit the hours of her availability for employment, given the ages of the children and the shared parenting arrangement, she should be available for more hours than she presently works. In addition to her work with the Nadeaus Auction Gallery, Mrs. Spencer purchases and sells items on her own, an activity which brings minimal additional compensation to her.
The defendant is fifty-one years old and completed three years of undergraduate school before joining the family manufacturing business in 1974. He is the president of Philbrick, Booth Spencer, Inc., a manufacturing firm which has been in his family's name since early in this century. For the past several years, the defendant has earned an annual salary of ninety thousand ($90,000) dollars, an amount presently limited by a restrictive covenant in the company's bank financing arrangement.
At present, the company, which is located in Hartford, has fifty active employees. The defendant owns one thousand, four hundred and fourteen (1,414) shares, or approximately thirty five and one half (35.5%) percent of the outstanding stock. In addition, there are several shares held by the profit sharing plan. and a trust over which the defendant has voting rights. As a consequence, he has voting rights for approximately sixty-seven (67%) percent of the company's stock.
While neither party presented expert testimony concerning the value of the defendant's stock interest in the business, the defendant testified that in 1994, in conjunction with a financing arrangement with the State of Connecticut, he was required to purchase additional stock in the company, and he paid one hundred and ninety-six ($196) dollars a share. Also relevant is evidence that upon the death of the defendant's mother, the stock was valued by the government at one hundred and forty-five ($145) dollars a share for estate purposes. Though the defendant acknowledged that he and his wife had stipulated that the value CT Page 3909 of the stock was one hundred and sixty-five ($165) dollars a share as of December 31, 1997, he now believes that figure is too high because the company continued to lose money in 1998 as it did in 1997.
The parties purchased the Hoskins Road property during the 1970's for seventy thousand ($70,000) dollars with a down payment of thirty-five thousand ($35,000) dollars and the financing provided by the defendant's parents. The first mortgage on the property was paid off shortly before the commencement of this action. At present, the residence is encumbered by a mortgage incurred a few years ago as a home equity loan in conjunction with improvements and an addition to the home. The balance of this debt is approximately forty-six thousand ($46,000) dollars, costing two hundred and eighty ($280) dollars a month. During the pendency of this matter, the defendant has made this mortgage payment.
The parties disagree concerning the value of the Hoskins Road property. It is a ten room brick colonial-style home situated on two and one half acres. Although the plaintiff had furnished an earlier affidavit in which she posited it's value as two hundred and twenty-five thousand ($225,000) dollars, her present affidavit states its value as one hundred and eighty thousand ($180,000) dollars.[1] The defendant values it at two hundred fifty thousand ($250,000) dollars, though on a financial statement prepared in 1998 in conjunction with his business, he stated its value then to be two hundred and twenty-five thousand ($225,000) dollars.
Each of the parties has substantial debt. Included in the plaintiff's affidavit is credit card debt of approximately fourteen thousand ($14,000) dollars she incurred in late 1998. Mrs. Spencer borrowed this sum in order to loan it to a business entity controlled by Austin Barney.
In February, 1996, approximately one month prior to her death, Margaret B. Spencer, the defendant's mother, executed the Margaret B. Spencer Irrevocable Trust Agreement in conjunction with her will. The defendant was designated executor of his mother's estate. The Trust was created for the benefit of the defendant and his sister, Pamela. It provides, in part, that upon Margaret Spencer's death, the Trust property would be divided into two equal portions for the defendant and his sister, and that each child's portion would then be divided by the CT Page 3910 trustee into two parts, an exempt trust and a non exempt trust. While the trust provides for its beneficiaries to have substantial powers, such as the power of appointment and the right to change trustees, it does not entitle the beneficiaries to any specific portion of the trust corpus or income during their lifetimes. Nevertheless, the children's private educational costs have been paid from these trust assets. Given the language of the trust and the history of payments, the defendant's expectation that the children's education will continue to be paid from the trust appears realistic. In addition to educational costs, there have been direct distributions to the defendant in the past two years totaling approximately twenty-four thousand, five hundred ($24,500) dollars. Though the trusts in question have spendthrift provisions, the defendant's beneficial interest in these assets, even though not fixed as a present right to receive a definite sum, represents the opportunity for the future acquisition of assets and income.
As of December 31, 1998, the market value of the Tax Exempt Trust for the defendant was approximately-thirty-eight thousand ($38,000) dollars, and the market value of the Non-Exempt Trust was approximately eleven thousand ($11,000) dollars.
In addition, at the time of her death, Margaret Spencer held an IRA with a market value of approximately two million ($2,000,000) dollars which, at her death, was divided into two. The IRA beneficiaries are the trusts created for the benefit of the defendant and his sister, Pamela. As a consequence, the defendant is the beneficiary of an irrevocable trust which, in turn, is the beneficiary of an IRA with a principal value of approximately one million, one hundred and fifty thousand ($1,150,000) dollars as of December 31, 1998. By law, a portion of the IRA principal must be paid annually to the Trust in which the defendant has a beneficial interest.
In addition to liquid assets, Margaret Spencer's estate consisted of two pieces of real estate, one in Martha's Vineyard and the other in Bloomfield where the defendant lives. After Margaret Spencer's death, the Martha's Vineyard property was sold, and with the proceeds another home was purchased as Pamela's residence. The defendant testified that since Pamela has the use and enjoyment of this home, he and she have agreed with the trustee that the sum of forty-eight thousand ($48,000) dollars should be deposited into a trust for his benefit, to equalize their respective housing benefits. CT Page 3911
On his financial affidavit, the defendant reports that he has several items of personal property worth one hundred nineteen thousand, five hundred ($119,500) dollars in the aggregate, a mutual fund known as American Funds Group with a balance of one hundred and eleven thousand ($111,000) dollars, IRA's worth twenty-one thousand ($21,000) dollars, and an interest in a profit sharing plan, the cash portion of which was valued at ninety-eight thousand ($98,000) dollars as of December 31, 1998. The defendant also has four life insurance policies with an aggregate death benefit of two hundred and fifteen thousand, five hundred ($215,500) dollars and a present cash value of twenty-three thousand, five hundred ($23,500) dollars.
The plaintiff indicates that she has two life insurance policies with an aggregate death benefit of seventy-six thousand, seven hundred ($76,700) dollars and a cash value of approximately eleven thousand, three hundred ($11,300) dollars. The parties also have vehicles and miscellaneous personal property. In the latter category is furniture and furnishings. The defendant left the family residence with little of its furnishings; he seeks a return to him of the items in the home provided to the parties from his grandparents.
In formulating its financial and property orders, the court has considered the statutory criteria enumerated in Connecticut General Statutes 46b-81 and 46b-82 applicable decisional law, the Child Support Guidelines, and the trial evidence.
With respect to child support, application of the Guidelines without regard to deviation criteria would require the defendant to pay approximately four hundred and fifty ($450) dollars to the plaintiff as weekly child support. Since, the parties share joint physical as well as legal custody of the children, the substantial amount of time the children are in the defendant's physical care warrants a deviation from the Guidelines. Accordingly, the defendant is ordered to pay to the plaintiff the sum of three hundred ($300) dollars a week as child support. In addition, the defendant shall be responsible for the purchase of the children's clothing. He shall also maintain the children as beneficiaries of his existing employment-related health care insurance for so long as they are eligible for coverage and he may be legally responsible for them. With respect to health insurance, the provisions of C.G.S. 46b-84 (d) regarding insurance reimbursement claims and checks shall apply and shall CT Page 3912 be recited in the judgment.
The defendant shall be entitled to claim the children as dependency exemptions.
As periodic alimony, the defendant is ordered to pay the plaintiff four hundred ($400) dollars a week to terminate upon the death of either party or the plaintiffs remarriage. Additionally, the provisions of C.G.S. 46b-86 (b) shall apply. It is the court's intention that these payments shall be treated for tax purposes as income to the plaintiff and deductible by the defendants. The plaintiff shall be entitled to continuing coverage under the defendant's employment-related health care insurance, at her cost, for such period of time and under such circumstances as allowed by applicable Federal law.
As a division of property, the defendant shall relinquish any claim he has to ownership of the Hoskins Road property, which is already in the plaintiffs name. The plaintiff shall assume and pay the home equity loan and hold the defendant harmless therefrom. The defendant shall transfer to the plaintiff one half the funds presently held in the American Funds Group. In making this transfer, the defendant shall ensure that the assets transferred to the plaintiff have no lower basis or lower interest or yield than the average basis, interest or yield of all funds he presently holds in this account.
The defendant shall transfer to an IRA account established by the plaintiff an amount of money equal to one half the value of his IRAs as of January 30, 1999. Additionally, by Qualified Domestic Relations Order, the defendant shall cause a transfer to an IRA account established by the plaintiff one half of the cash portion of his profit sharing plan, valued as of January 30, 1999.
The defendant shall be entitled to ownership of his stock-interest in Philbrook, Booth Spencer, Inc., free and clear of any claims by the plaintiff.
With respect to household furnishings and other personalty, each party shall be entitled to ownership of the items he and she presently possesses, except the defendant shall be entitled to the following items remaining in the former family residence: articles related to his hobbies, items he owned prior to the marriage, items given to the parties or to the defendant by CT Page 3913 members of the defendant's family. As exceptions, the wood stoves, maple twin beds in Mallory's room, and the maple highboy located in Colin's room shall remain in the home and become the property of the plaintiff. With respect to large items in the yard relating to the defendant's hobbies and left there at the time of separation, the defendant shall be entitled to their ownership and shall cause their removal from the property within ninety days of this date. As to the items in the house determined to be the defendant's property, the parties shall arrange a mutually convenient date, within forty-five days of this memorandum, for the defendant to retrieve these items.
With the exception of orders made herein, each party shall be entitled to ownership of the assets listed on his or her financial affidavit. Similarly, except as ordered to the contrary, each shall be responsible for the debts listed on his or her financial affidavit and shall hold the other harmless therefrom.
No fees are awarded to either party.
Unless otherwise stated, all transfers of assets shall take place within forty-five days of this memorandum. The court shall retain jurisdiction of the property aspects of this decision in order to make any further orders which may be necessary to effectuate the terms of this memorandum.
Counsel for the plaintiff shall prepare the judgment file.
Bishop J.